UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 14-21515-CV-GAYLES/TURNOFF

JACOB LUIHN &
JOHANA LUIHN,

    Plaintiffs,

vs.

MX, INC., a Florida corporation, FRANK
NICHOLS, an individual, and
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY.

    Defendants.

_____/

## ORDER

**THIS CAUSE** is before the Court upon Plaintiffs Jacob Luihn and Johana Luihn's ("Plaintiffs'") Motion for Sanctions for Defendants' Spoliation of Evidence. **(ECF No. 91)**. A hearing on this Motion **(ECF No. 91)** took place before the undersigned on Monday, March 16, 2015. **(ECF No. 117)**. A reconvened hearing took place on Thursday, March 19, 2015. **(ECF No. 123)**. Upon review of the Motion, the Response, the Reply, the court file, and hearing argument from counsel, the undersigned finds that Plaintiffs have not met their burden of establishing bad faith, accordingly, the Motion is **DENIED.**[1] In denying the Motion, the Court by no means condones what has occurred here.

---

[1] Fed.R.Civ.P. 72(a) authorizes magistrate judges to issue orders on any type of pretrial matter not dispositive of a party's claim or defense. Gomez v. Martin Marietta Corp., 50 F. 3d 1511, 1519-20 (10th Cir. 1995)( in determining between dispositive and non-dispositive sanctions, the critical factor is what sanctions are actually imposed). Magistrate judges in this district have entered orders on motions for sanctions, wherein the moving party seeks default or dismisal for spoliation. See e.g., Commercial Long Trading Corp., v. Scottsdale Ins. Co., No. 12-22787-CIV, 2013 WL 1100063, at *1, fn1 (S.D. Fla. Mar. 15, 2013); see also, Calixto v. Watson Bowman Acme, Corp., No. 07-60077-CIV, 2009 WL 3823390 (S.D. Fla. Nov. 16, 2009).

The conduct of Defendants Don Martin ("Martin") and MX, Inc. ("MX") is, in this Court's view, beyond negligent. In fact, it borders on gross negligence, if not recklessness. Nevertheless, for the reasons stated below, and consistent with the applicable law, the undersigned must find that the relief requested is not appropriate.

It is important to note at the very outset that this matter was scheduled for hearing on February 13, 2015. The parties had over one month of notice. **(ECF No. 94)**. The hearing was noticed as being evidentiary in nature. Id. Implicit in such an Order, especially as related to the type of Motion at issue here, is that testimony was expected as to, among other things, the alleged spoliation. As a courtesy, Chambers staff contacted both sides on Thursday, March 12, 2015 to confirm the hearing and the evidentiary nature of same. Subsequently, it became clear that further clarification was needed. That same day, the undersigned entered a Paperless Order that stated as follows.

> This Court's Order/Notice, which was filed on February 13, 2015, reflects that the hearing shall be evidentiary in nature. See 94. In light of the allegations raised in the Motion, all parties related to same must appear in person at the hearing. No requests for telephonic appearance shall be entertained. Absent exigent circumstances, no continuances shall be granted.

**(ECF No. 113)**.

Immediately thereafter, Defendants filed an Emergency Motion for Continuance of Hearing claiming unavailability. **(ECF No. 114)**. In the Motion, Defendants allege that Martin, the principal of MX, and the alleged spoliator, was "undergoing a medical procedure outside of the State of Florida on Monday, March 16, 2015."[2] Id. No further details were provided. No further explanation was given. Typically, when such relief is requested, the parties submit affidavits or documentation from medical providers in support of their position. That was not done here. The Motion was denied. **(ECF**

---

[2] The Motion also alleged that efforts to contact Defendant Frank Nichols had been unsuccessful. Id.

**No. 115)**.

Frank Nichols appeared at the hearing.[3] Don Martin did not. Upon questioning by the undersigned, defense counsel was unable to provide any further explanation for Martin's failure to appear. No testimony was heard. In the interest of judicial economy, and in light of this action's May 2015 trial date, the Court heard argument and considered only the submissions.

## Background

The accident that gave rise to this action occurred on March 13, 2012. Plaintiffs served Defendants with a Spoliation Letter within a few months, on August 31, 2012. **(ECF No. 91-20)**. The letter is painstakingly detailed. It lists specific information (over 39 listed items, along with multiple subparts) that must be preserved. In their Motion, Plaintiffs allege that Defendants, MX and Martin, ignored the letter and "burned the hours of service logs, [along with ] supporting documents and other key records." **(ECF No. 91)**.

According to Plaintiffs, there is no doubt that at least some of the requested items existed at one time. In this connection, Plaintiffs contend that MX was aware of its duty to preserve its drivers' "hours of service" logs, supporting documents, as well as a driver qualification file. In their Motion, Plaintiffs argue that despite a clear duty to preserve this evidence, pursuant to the Spoliation Letter and the applicable federal regulations, MX destroyed most, if not all, of it. Plaintiffs seek a wide range of sanctions for spoliation of evidence, including, but not limited to, the striking of pleadings, default judgment, and adverse inferences.

---

[3]Defendants also produced D.Z. Patterson at the hearing. Mr. Patterson is an investigator with Travelers Investigative Services in Alpharetta, Georgia. **(ECF No. 110-6)**. He submitted an Affidavit stating that he never interviewed Don Nichols. He also indicated that he spoke with Don Martin on May 22, 2012. Patterson's notes regarding same are attached to his affidavit. Id.

## Applicable Law

Spoliation is defined as the destruction or concealment of evidence. Southeastern Mech. Servs., Inc. v. Brody, No. 8:08-CV-1151-T30EAJ, 2009 WL 2242395, at *2 (M.D. Fla. July 24, 2009). Federal law governs the imposition of sanctions for spoliation of evidence, even in diversity cases. Santana v. RCSH Operations, LLC, No. 10-61376-CIV, 2011 WL 688723, at *1 (S.D. Fla. Feb. 18, 2011). In addressing these issues, Florida district courts look to Florida state law for guidance, as long as the principles are consistent with federal spoliation principles. See e.g., FTC v. Nationwide Connections, Inc., No. 06-80180-CIV, 2007 WL 4482607, at *1 (S.D.Fla. Dec. 19, 2007)(Florida based federal courts look to Florida law for guidance on when to impose sanctions for spoliation); see also, Wilson v. Walmart Stores, Inc., No. 5:07-cv-394-Oc-10GRJ, 2008 WL 4642596 (M.D. Fla. Oct. 17, 2008).

The party alleging spoliation must prove that: (1) the missing evidence existed at one time; (2) the alleged spoliator had a duty to preserve the evidence; and that (3) the evidence was crucial to the movant being able to prove its *prima facie* case or defense. Walter v. Carnival Corp, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010); see also, Managed Care Solutions, Inc., v. Essent Healthcare, Inc., No. 09-60351, 2010 WL 3368654, at *5 (S.D. Fla. Aug. 23, 2010). Even if all three elements are met, the movant must show, through direct or circumstantial evidence, that the absence of the evidence is predicated on bad faith. Bashir v. Amtrak, 119 F. 3d 929, 931 (11th Cir. 1997); see also Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F. 3d 1284, 1294 (11th Cir. 2003).

The negligent destruction of evidence is not tantamount to bad faith. Walter, 2010 WL 2927962, at *2 (citing Vick v. Tex. Employment Comm'n, 514 F.2d 734, 737 (5th Cir. 1975)). In other words, mere negligence in losing, or destroying, evidence is insufficient to justify an adverse inference of spoliation. Bashir, 119 F. 3d at 931. In fact, even grossly negligent conduct fails to justify

4

such an inference. Preferred Care Partners Holding Corp. v. Humana, Inc., No. 08-20424-CIV, 2009 WL 982460, at * 7 (S.D. Fla. Apr. 9, 2010). In this connection, the Preferred Care case is instructive. There, the Defendant, Humana, Inc., admitted that it was unaware that thousands of relevant documents existed until one month before trial. Id. Upon learning of their existence, Humana was "faced with the conundrum of realizing that its employees failed to [delete] tens of thousands of emails as they were required to do," pursuant to a confidentiality agreement that was the basis for the lawsuit. Id. Humana's counsel ordered employees to print hard copies of the documents and purge them from their computers. Id. at *7. There, the court found that although Humana's conduct was clearly egregious, its shortcomings were neither intentional, nor done in bad faith, but rather resulted from the grossly negligent oversight of its counsel. Id. In sum, courts in this Circuit refrain from imposing spoliation sanctions, even where there is an undisputed destruction of evidence, when no bad faith is shown. See e.g., Soca v. Northwestern Mut. Life Ins. Co., No. 07-20336, 2010 WL 3894142, at *1 (S.D. Fla. Sept. 30, 2010)(doctor negligently failed to suspend policy of purging inactive patient files after learning that the contents of files were related to disability claim); Atlantic Sea Co., S.A. v. Anais Worldwide Shipping, Inc., No. 08-23079-cv, 2010 WL 2346665, at *1 (S.D. Fla. June 9, 2010) (failure to preserve spotlight and electrical wiring); United States v. Barlow, 576 F.Supp.2d 1375, 1381 (S.D. Fla. 2008)(loss of PVC marker used to identify the location of ship's grounding in action by government against boat owner for destruction of underwater sanctuary).

*Spoliation Letter*

When questioned about the Spoliation Letter, Martin testified as follows.

Q. Sir, this is a [a letter[4]] that was sent to Craig Montz, at the law offices of Esther Nicklas.

---

[4]The question was posed in relation to the spoliation letter.

>   And this is apparently, your lawyers [sic] at one point? Do you recognize these folks at all?
>
>   A.  The name but I'm not – you know, I've gotten so many in the last two and a half years its been hard for me to keep up with any of them.
>
>   Q.  All right. Looking at Exhibit 7, do you recall receiving a copy of this letter from your lawyers saying, Please save all this information?
>
>   A.  I – I don't. I really don't. And if I did, it's in that file with my insurance stuff, in Frank Nichols' file.

**(ECF No. 110-3; 23:3-17).**

*Hours of Service Logs*

Defendants have stipulated that Nichols' hours-of-service logs existed at some point, and that MX had a duty to preserve them.[5]  **(ECF No. 110)**. Defendants, however, dispute that the logs are crucial to Plaintiffs' ability to prove a *prima facie* case. They also deny that the logs were destroyed in bad faith. Plaintiffs argue that the logs are crucial because they could show, *inter alia*, that Nichols was fatigued, and therefore ran the red light and caused the accident.

Here, Martin testified that he burned, as in set on fire, company documents, that may have included the logs in furtherance of winding down his business, and closing up shop. Specifically, Martin testified as follows:

>   Q. I understood that often your records went into storage for six or seven years and that you have a storage area [where] you put older records?
>
>   A. I did for a while. But now because of going out [of business] I've been trying to close up and go out of business for the last two or three years now, well, my customers say the last ten years I've been saying it, but anyway, we've been burning the documents and getting rid of them.

---

[5]Martin testified that he was familiar with the Federal Motor Carrier Safety Regulations ("FMCSR") on record keeping, and the fact that he was required to save all documents regarding the driver and the truck while a claim or litigation was pending. **(ECF No. 110-3; 27:7-13)**.

6

> Q. All right. So all the documents that you had in the - - were they in a storage shed? Where were – the older documents kept before you burned them?
>
> A. I had no specific place.
>
> Q. Okay.
>
> A. I stored them in difference places here and out there in one of the trailers.
>
> Q. All right. And over the last couple of years those documents have been part of the tinder you used to start bonfires?
>
> A. Yes.

**(ECF No. 110-3; 32:1-22).**

> Q. All right. There were – were there any significant changes at MX that made keeping documents harder than at any other point in time since the date of the wreck?
>
> A. No. Now wait a minute. Right after this wreck is when I had that operation and I was out. And then when I came back I – I really was just on the phone a little bit. And my record keeping got really, really bad because I didn't do it.

Id. at 50:18-25.

> Q. Did anybody manage the business for you while you were in the hospital?
>
> A. No.
>
> Q. So you were still the person in charge of doing everything at MX, Inc."
>
> A. Yes.
>
> Q. Including the creation and storage of documents?
>
> A. Yes.

Id. at 51: 1-10.

As outrageous as this testimony sounds, it is completely consistent with the grossly negligent record keeping practices of MX. There is no question that the only policy and procedure in place at

MX was that there was no policy or procedure in place. MX operates out of a barn - literally.[6] Their record keeping was non existent. That has always been the case, even before this accident. Their safety record, among other things, speaks to that. Basically, MX is a one-man operation in rural Georgia. That one man is Martin, and he has zero business sense. Contrary to Plaintiffs' assertions, Martin is not a sophisticated individual. Nothing could be further from the truth. The fact that the documents related to this particular crash were destroyed/lost should not come as a surprise, given Martin's business practices and track record of over thirty years.

A few examples of past safety reviews, and resulting violations, are summarized below.

On October 19, 2006, MX was found to have twelve (12) safety violations during a compliance review including: (1) disqualified drivers; (2) medically uncertified drivers; (3) hours of service violations; and (4) false logs. **(ECF No. 90, Ex. 13)**. It was also noted that MX failed to require drivers to prepare records of duty status as prescribed by the regulations. A October 29, 2007 review resulted in another fifteen (15) violations, including, "failing to retain evidence of brake inspector's inspections," "using a commercial motor vehicle not periodically inspected." Some of the recommendations were, "ensure that all drivers are fully and properly qualified before operating in interstate commerce." In this connection, MX was directed to "maintain a complete file as required for each driver, documenting the qualification process." See **(ECF No. 91-14)**. Along these same lines, MX was instructed to "not allow drivers to drive [on the] interstate unless they have been physically re-examined each 24 months." Id.

A December 10, 2010 review resulted in a "conditional safety rating." This time, 9 violations

---

[6]A DOT inspector noted in his report that "the carrier uses their barn as the principal place of business." The upstairs (loft) of the barn is the offices of MX, Inc. **(ECF No. 91, Ex. 14; Part C)**.

were found, including, failing to maintain driver qualification files on each driver employed, using a disqualified driver, permitting hours of service violations, and failing to preserve driver logs for six (6) months. **(ECF No. 91-16)**.

It is clear that MX knew that it was duty-bound to preserve these logs. It is also clear that it outright ignored these duties. MX's conduct is disastrous. In fact, the undersigned questions why the Department of Transportation allowed them to remain operational for so long with this kind of record. Unfortunately, however, grossly negligent sub- par record keeping, and downright ignorance, falls short of what is required to prove bad faith, even circumstantial bad faith.

Having considered the entire record in this case, as well as the applicable law, the undersigned finds that the destruction of these logs can be credibly explained, by the reason proffered by Martin, as not involving bad faith.

Here, Martin makes no apologies. He doesn't even attempt to sugarcoat his failings. Upon questioning about the inspections and his record keeping deficiencies he testified as follows.

> . . . I told them [the inspectors] every single time, don't come up here and check me because I'm not changing. And they still come on to get that money. That's just the way it is. And I was straight upfront with them every time they'd call me.

**(ECF No. 110-4; 23:2-6)**.

As if that weren't bad enough, Martin testified that his business was basically left unattended while he underwent surgery, and during a subsequent hospital stay. As a result, his already deficient record keeping became worse. To add to an already bad situation, he decided to start burning documents in the course of MX's dissolution. By his own admission, almost as a badge of honor, he states "the biggest fine [he] ever got was [due to his] paperwork[and] not keeping it up." **(ECF No. 110-4; 22:7-9)**. By all accounts, it seems as though he just didn't care.

9

Without prejudging this case, it is fair to say that Plaintiffs have amassed ample evidence as to MX's safety violations and Nichols' extensive driving record. Some additional records may be easily obtainable through a public records request. Further, eyewitness testimony from Mr. Boffill, among others, may lend support to Plaintiffs' claim that Nichols ran the red light. In addition, Plaintiffs' expert has conducted a thorough analysis and has concluded that MX's practices failed to meet the regulatory practices for, among other things, supervision and retention of employees.

Lastly, Plaintiffs are also free to obtain additional information from third-party sources, albeit at this late date, as to purchases made by Nichols during the trip in question. For example, from the record, it appears that Nichols made purchases for fuel and other items using Martin's credit card while on these trips. Those records, among others, can be used to piece together a time line, and establish Nichol's driving hours and determine whether he exceeded his maximum allotment. The point is, Plaintiffs are not left without evidence, and they are not foreclosed from presenting and/or proving their case. Accordingly, and consistent with the above, spoliation sanctions are not warranted. A finding to the contrary would likely result in reversible error.

*Driver Qualification Records*

In its Motion, Plaintiffs argue that they have repeatedly requested Nichols' "Driver Qualification Records," i.e., documents that would show that MX properly qualified Nichols as a driver. Plaintiffs suggest that these documents were also burned. Again, Plaintiffs argue that MX was required to preserve such records pursuant to the Spoliation Letter, as well as the applicable federal regulations that govern carriers such as MX. See FMCSR § 391.51 ( c).

Defendants, on the other hand, dispute that the records were destroyed. According to MX, to the extent that Martin kept any semblance of a "driver qualification file" on Nichols, same has been

turned over to Plaintiffs. In their view, the fact that he failed to maintain what he should have, or create a proper driver file on Nichols, does not constitute bad faith. Again, the undersigned would have to agree.

Martin's testimony on these issues consistently reveals that he did not keep the sort of documents that he was required to keep. Along these same lines, he testified that he never asked Nichols for any healthcare records. **(ECF No. 110-3;19:1-3)**. He did not conduct drug testing, so he has no such records. Id. at 15:21-25. Similarly, He did not keep the "medical cards" associated with Nichols' medical exams. Id. 14:14-18. He also has "no idea" where Nichols' DOT annual medical exam (fitness for duty) records are located. Id. at 19:19-23). Of course, he has no payroll records to show the number of loads that Nichols has hauled for MX. Id. at 21:16-19. He likewise has no log books that would show the times that Nichols drove for him. Id. at 20-22. He also testified that he does not require his drivers to turn in their logs in order to get paid. Id. at 27:14-18. Similarly, he kept no copies of the "trip packets[7]" that he gave to Nichols. He conceded that it was not his practice to request or maintain any documents that supported the driver's hours of service, e.g., fuel receipts, weight tickets, etc. Id. at 29:1-10. He likewise never required Nichols to signs a safety policy, a driver handbook or a set of company procedures. Id. at 31:14-25. In sum, the testimony shows that he turned over the only file, albeit deficient, that he kept on Nichols. **(ECF No. 110-3; 11:13-25)**.

Again, this lack-luster record keeping is consistent with MX's practices. As illustrated above, MX was cited several times for failing to keep proper records on its drivers. As noted by one inspector in 2006,

---

[7]The trip packets were described as containing the number of miles and the rate of pay for each particular trip. Id. at 27:21-25.

11

> Employment applications were missing complete with employment histories, traffic accident/conviction history, improper company name, and driver's signature.
>
> * * *
>
> Evidence that two of the three drivers who drove for MX, Inc in the past 6-month period were not medically examined and certified during the preceding 24 months as required.

**(ECF No. 91-13)**.

Consistent with the reasons cited above, the undersigned finds that spoliation sanctions are not appropriate as to the driver qualification files either. The record certainly contains enough information as to Nichols' driving records, including Nichols' own testimony, so as not to foreclose Plaintiffs from addressing these issues at trial.

It bears noting that the denial of this Motion does not bar Plaintiffs from seeking the introduction of evidence relating to these matters at trial. Further, this Order does not preclude Plaintiffs from raising the issues of, among other things, the applicable regulations, Defendants duties, and its shortcomings, as a commercial carrier. In other words, Plaintiffs shall be able to explore these matters by way of cross-examination at trial, subject to Judge Gayles' rulings.

Neither party should misread this Order to suggest that the undersigned condones what went on here. In fact, the court echos the words and sentiment of distinguished counsel from Georgia... MX's conduct is "Darn wrong." Unfortunately, on this record, the law does not support the requested spoliation sanctions.

Accordingly, is hereby **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Sanctions for Defendants' Spoliation of Evidence **(ECF No. 91)** is **DENIED**. The Court defers ruling on the issue of attorneys' fees and costs subject to the refiling of a separate pleading by Plaintiffs.

12

*Miscellaneous Matters - Investigative Notes*

This issue was raised by Plaintiffs in their request for spoliation sanctions. Further details were included in Plaintiffs' Reply to Defendants' Response. In essence, Plaintiffs were seeking sanctions due to non-compliance with the Court's prior Order as to the production of certain investigative notes. See **(ECF No. 56)**. During the reconvened hearing, on Thursday, March 19, 2015, counsel represented that Plaintiffs had agreed to withdraw this request. Accordingly, it is hereby **ORDERED AND ADJUDGED** that this issue is **DEEMED MOOT**. Further, the undersigned has reviewed the one and a half page submission at issue in camera. Nothing contained therein changes this ruling.

**DONE AND ORDERED** in Chambers at Miami, Florida on this ___ day of March 2015.

WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE

cc: Hon. Darrin P. Gayles
Counsel of Record