UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-CV-21515 – GAYLES/TURNOFF

JACOB LUIHN and JOHANNA LUIHN,

        Plaintiffs,

v.

MX, INC and FRANK NICHOLS,

        Defendants.

**PLAINTIFF'S MOTION *IN LIMINE* TO LIMIT DR. CHARLES CITRIN**

       Plaintiffs, Jacob Luihn and Johanna Luihn, filed a separate motion to strike certain experts that Defendants failed to properly and/or timely disclose, including Dr. Charles Citrin. Should the Court permit Dr. Citrin to render any opinions in this case, Plaintiffs move *in limine* to limit Dr. Citrin's testimony as set forth herein.

## ARGUMENT

**1. Any testimony Dr. Citrin is offering a medical opinion or medical diagnoses or acting as a medical expert.**

       Dr. Citrin is a radiologist. (Ex. A - Citrin p. 33:8). He reads scans, generates reports, communicates with referring physicians and ensures that imaging quality is high. (Ex. A - Citrin p. 33:8-12). In the present case, Dr. Citrin's report is of reviewing studies. Dr. Citrin does not have a relationship with Mr. Luihn and doesn't represent Mr. Luihn as a physician and is not in a position to offer any interpretations of any film studies as a basis for treatment. (Ex. A - Citrin p. 35:12-17). Dr. Citrin is not licensed to practice medicine in Florida and carries no malpractice insurance for any medical work performed by him in Florida. (Ex. A - Citrin p. 34:22 – 35:1).

1

Dr. Citrin does not consider his work in this case the practice of medicine. (Ex. A - Citrin p. 36:4-7). Dr. Citrin is not treating Jacob Luihn for any injuries (Ex. A - Citrin p. 26:18-21). Dr. Citrin never saw Jacob Luihn as a patient. (Ex. A - Citrin p. 26:22-23). Citrin never had a doctor-patient relationship with Jacob Luihn. (Ex. A - Citrin pp. 26:24 – 27:1). He has practically zero experience as a hands-on practitioner, prescribing medicine, physical therapy, injections and things of that matter. (Ex. A - Citrin p. 34:14-18)

Dr. Citrin is not practicing medicine in this case. (Ex. A - Citrin pp. 84:7-22). He is acting as a consultant to Mr. Padilla and his firm as a forensic medical expert. (Ex. A - Citrin p. 119:18-19). Dr. Citrin has no internship or fellowship and is not licensed in neurology. (Ex. A - Citrin p. 28:4-7). Dr. Citrin has no internship or fellowship and is not licensed in psychiatry, neuropsychiatry, hematology, infectious diseases, pathology, epidemiology, orthopedic surgery, neurosurgery, and life care planning or vocational economics. (Ex. A - Citrin p. p. 29:1-25). Dr. Citrin has never held himself out as a treating physician in any of those areas and is not certified by any board or organization in any of those areas. (Ex. A - Citrin p. 30:1-8).

Dr. Citrin should be prevented from testifying that he has made any diagnosis of Mr. Luihn in this case and should be prevented from couching any of his opinions as diagnoses or using the term diagnosis in rendering his opinions. Throughout his deposition Dr. Citrin asserted that has only been acting as a consultant to the defense attorneys.

### 2. Any Opinions as to the Cause of the Symptoms of Jacob Luihn or to Imaging Findings Unrelated to the Cause of Jacob Luihn's Symptoms.

The 11th Circuit requires trial courts acting as gatekeepers to engage in a "rigorous three-part inquiry" assessing whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony

assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier,* 387 F.3d 1244, 1260. The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each prong. *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care,* 582 F.3d 1227, 1232 (11th Cir. 2009). See: *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) Absolute certainty of an expert is not required. *See Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir.1988). However, an expert must know "facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation," *see id.,* and an expert's assurances that he has used generally accepted scientific methodology are insufficient, *see McClain,* 401 F.3d at 1244. See: *Tillman v. C.R. Bard, Inc.*, 2015 WL 1456657, at *6 (M.D. Fla. Mar. 30, 2015) Taking the expert's word for it is precisely what Dr. Citrin suggests the district court should do in this case. However, "[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1201 (11th Cir. 2010)(citations omitted).

> A reliable differential etiology analysis is performed in two steps. First, the expert must compile a "comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration. ... The issue at this point in the process is which of the competing causes are generally capable of causing the patient's symptoms." *McCl*ain, 401 F.3d at 1253 (quoting *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057–58 (9th Cir.2003)). Second, the expert must eliminate all causes but one. See *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).
>
> With regard to the first step, the district court must ensure that, for each possible cause the expert "rules in" at the first stage of the analysis, the expert's opinion on general causation is "derived from scientifically valid methodology." *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1211 (10th Cir.2002) (quoting *Siharath v. Sandoz Pharms. Corp.,* 131 F.Supp.2d 1347, 1362–63 (N.D.Ga.2001)).

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1195 (11th Cir. 2010).

> In the second step of the differential etiology analysis, the expert must eliminate all causes but one. See *McCullock*, 61 F.3d at 1044. While the first step focuses on general causation, in the second step the expert applies the facts of the patient's case to the list created in the first step in order to form an opinion about the actual cause of the patient's symptoms, i.e., to determine specific causation. In Clausen, the Ninth Circuit stated that an "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." 339 F.3d at 1058 (internal quotation omitted). Thus, "[a] district court is justified in excluding evidence if an expert 'utterly fails ... to offer an explanation for why the proffered alternative cause' was ruled out." Id. (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir.2001)).

Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1197 (11th Cir. 2010)

Dr. Citrin diagnoses chronic ischemic disease of the brain prior to 2004, resulting in a stroke of the left caudate region. [Doc. 105-1, p. 11) No doctor or expert, including Dr. Citrin, has indicated that any of the symptoms Jacob Luihn has had pre-existed the wreck. No doctor or expert has indicated any cause for the symptoms Jacob Luihn has other than the wreck itself. Dr. Citrin's findings (which no other doctor sees in the films as all treating radiologist and neuro radiologists report normal imaging scans of Jacob Luihn's brain in 2004, 2010, and the two (2) scans in 2012. (Ex. A - Citrin p. 128:24-129:24)), upon a review of the films and images include:

1. Encephalomacia (Jan 2004 CT scan – [Doc. 105-1, p. 4]) (Encephalomacia is old stroke. Ex. A - Citrin p.67:8)

2. Abnormal signal, bilateral zones of leukoaurosis, cavitation, encephalomacia, and appearance of left sided stroke (March 20, 2010 MRI – [Doc. 105-1, p. 4, *2]) (leukoaurosis are nonspecific changes in the cerebral white matter; cavitation is a complete loss of the brain structural material. Ex. B - Walker p. 67:19-22)

3. Encephalomacia and mild cerebral atrophy, somewhat greater than expected (March 13, 2010 CT Scan – [Doc. 105-1, p. 5, *3])

4

4. Encephalomacia, additional hypodensity, (May 11, 2012 CT Scan – [Doc 105-1, p5, *4])

5. Bundle of abnormal beaded vessels, cerebral vasculitis, leukomalacia, isomorphic gliosis/demyelination secondary to systemic disorder and inconsistent with cerebral micro bleed associated with shear injury, thrombosed venous angioma, vascular malformation, ischemic microvacular disease, inflammatory angiopathy, multiple sclerosis (MS), congenital problems, decreased FA due to prior ischemic damage, (June 19, 2012 MRI – [Doc. 105-1, p.5-7 *5).  Dr Kagan, in his deposition, states the original report was wrong and Jacob Luihn in fact has traumatic brain damage from the wreck (Ex. C - Kagan pp. 55:21-56:24, 95:21-96:13, 102:21-103:2), and does not have the identified issues.

6. Dr. Citrin did not review films and is merely reciting hearsay, not otherwise admissible. (Jan 7, 2013 MRI – [Doc. 105-1, p. 8 *6])

7. Dr. Citrin did not review films and is merely reciting hearsay, not otherwise admissible. (Jan 7, 2013 MRI – [Doc. 105-1, p. 8 *7])

8. Infarct/leukomalacia, chronic ischemic disease, (March 18, 2013 MRI – [Doc. 105-1, p. 8 *8) (Infarct means stroke (Ex. A - Citrin p. 75:1-2), ischemia means low blood flow. (Ex. A - Citrin p. 55:19-20))

**Critically, no neurologist, doctor, or other medical expert has opined that any of Jacob Luihn's symptoms have come from any of the problems Dr. Citrin uniquely sees and identifies amongst all the doctors in this case and that have previously treated Jacob.** Even the defense expert neurologist, Dr. Lopez, swore under oath that there were no signs or symptoms of cerebral vasculitis, ischemic microvascular disease, inflammatory angiopathy,

demyelinating disease (such as swelling of the brain, leukoencephalopathy, radiation injury, metabolic disorder or MS). (Ex. D - Lopez p. 50:7 - 51:3). Dr. Dorto, the defense physiatrist expert in this case swore under oath that Jacob Luihn's symptoms arise from traumatic brain damage caused by the wreck. (Ex. E - Dorto p. 98:18-24). Dr. Citrin opines these problems existed prior to 2004 but has no idea of any of medical record or witness that shows Jacob Luihn had any of the symptoms that arose from the wreck. (Ex. A - Citrin p. 52:11-55:8)

> Q   And my only question -- and I'm going to -- and I may have asked it poorly -- is do you have any explanation for the symptoms that Jacob Luihn stated that he has, that his family members stated that he has, from a medical basis as a doctor testifying here in Florida?
> A   Oh, that's a different question.  I don't have the answer for that.

(Ex. A - Citrin p. 134:18-25).

None of the alleged imaging issues that Dr. Citrin opines existed had any impact on Jacob Luihn's ability to lead a full and normal life prior to the wreck. Without causation, the unrelated imaging findings must be excluded as irrelevant and highly prejudicial. The Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the **expert**." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Further Dr. Citrin provided no testimony that would indicate his opinions are generally accepted by the scientific community. Nor did he provide any peer reviewed studies that showed he was correct in his process or opinions, to the contrary he stated he did not have such studies. While Dr. Citrin stated he saw a number of different things on Jacob Luihn's imaging tests, nowhere did he – or any other doctor - state any of these were a cause for the symptoms documented by the plaintiff, his family, friends, and treating doctors. As such his opinion as to

Jacob Luihn's injuries, or lack thereof, are not meaningful or helpful to a jury trying to rule in or rule out Jacob Luihn's damages without sheer speculation.

Even if Florida law permits experts to opine about a variety of possible causes, under the Federal Rule of Evidence 702 such testimony must still be "rooted in something other than 'surmise, conjecture and speculation.'" *Shreve v. Sears, Roebuck & Co.,* 166 F.Supp.2d 378, 408 n. 20 (D. Md. 2001).

It would thus be an abuse of discretion to admit Citrin's testimony. *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record."). See: Wilson v. Saint-Gobain Universal Abrasives, Inc., 2015 WL 1499477, at *8 (W.D. Pa. Apr. 1, 2015).

Dr. Citrin should not be allowed to opine that the post wreck punctate hemorrhages shown on imaging pre-existed the wreck. Specifically Dr. Citrin states because they CANNOT be seen on the earlier scans, the punctate hemorrhages must be there. This is sheer speculation. He stated:

> Q. And if we looked at the images that you have in this case at the gray-white junction of Jacob Luihn prior to March 13th, 2012, the date of the wreck, did you find any punctate hemorrhages at the gray-white junction?
>
> A. The answer is no. And the reason for that is that the proper scan sequence that would allow you to see those hemorrhages was not done as part of that study in 2010 because the diagnosis for which the study was being performed did not include the concern for hemorrhage; therefore, no search was done for a hemorrhage or hemorrhagic residua, and you would not see any abnormality, whether it were present or not.
>
> Q. So you would have to speculate to say that there is punctate hemorrhages at the gray-white junction of Jacob Luihn prior to March 13th, 2012?
>
> A. I would -- I would put it the other way. I would say that the lack of visualization does not exclude the presence of such abnormalities.

7

> Q. I understand. But that would be – anything in the world, I believe you've testified to, is possible, but we're talking about medical probabilities.
>
> A. Yes.
>
> Q   And in regards to a medical probability, you would not be able to, as a doctor, say to a reasonable degree of certainty that punctate hemorrhages existed at the gray-white junction prior to March 13th, 2012, because you don't have that scan; fair?
>
> A   No. Let me respond. In reference to Mr. Luihn, let me try to be more specific. We're not discussing punctate-type hemorrhages. He doesn't have punctate-type hemorrhages even after the accident. He has linear-type of areas of hemosiderin deposition that are present in two different areas of the brain, which, in my opinion, within a reasonable degree of medical certainty, were present in 2010.
>
> Q   So it's your testimony that you can't see punctate images on the -- any of the scans Jacob Luihn had prior to the wreck; fair?
>
> A   Again, I don't believe that he has punctate -- punctate hemorrhages after the accident either. But, yes, that is my testimony.

(Ex. A - Citrin p. 62:20-64:13).

### 3. Any by Dr. Citrin attempt to challenge findings by Dr. Walker that Mr. Luihn has brain atrophy caused by collision.

Dr. Citrin attempted to challenge certain measurements made by Dr. Walker to show atrophy in Mr. Luihn's brain by comparing atrophy present in various studies of Mr. Luihn's brain. (Ex. A - Citrin p. 100-101). Dr. Citrin claimed that the CT scan that Dr. Walker had used was invalid due to improper position if the head within the scanner. Such opinions should be excluded. Dr. Citrin was not present during the scans and has no verifiable means by which to make such an opinion. Moreover, Dr. Citrin does not know what standards Dr. Walker or Dr, Kagan used to determine what normal progression of brain atrophy is and cannot comment or opine on their testimony regarding the same. (Ex. A – Citrin p. 98:22 – 100:1). Further Dr. Citrin didn't try to make the measurements and doesn't know if he could or could not make

them. (Ex. A - Citrin p. 102:17-22) Dr. Citrin doesn't know the software involved, doesn't own it, but admits Dr. Walker might be able to take the measurements. (Ex. A - Citrin p. 102:23-103:25)

Even if the head was not optimally positioned, Dr. Citrin is ignorant to the methodology used by Dr. Walker to make his measurements and comparisons. Therefore, Dr. Citrin's opinions in this regard are simply speculative and should be excluded.

Dr. Citrin is unable to define what a normal base rate of brain atrophy is to determine whether there was a normal, or abnormal change, and has no articles, texts, or publications that allow him to state what normal brain atrophy would be for Mr. Luihn. (Ex. A - Citrin p. 94:19-97:21). He should not be able to state there was normal or abnormal brain atrophy.

Dr. Citrin failed to report in his disclosures or records in his file any specific measurements of Jacob Luihn's brain for atrophy, to specifically include the transverse ventricles of Jacob Luihn's brain, and should be forbidden from testimony as to any measurements of atrophy or lack thereof. (Ex. A - Citrin p. 76:8-77:20). "[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process ...." *In re Viagra Products Liab. Litig.*, 658 F. Supp. 2d 950, 959 (D. Minn. 2009) (citing *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996)).

**4. Fractional Anisotropy (FA) is of no Value in determining the presence or absence of Traumatic Brain Damage**

Dr. Citrin states that fractional anisotropy (FA) used in diffuse tensor imaging (DTI) is of no value in determining the presence or absence of traumatic brain damage. [Doc. 105-1, p.10] However he uses FA in his own practice (Ex. A - Citrin p.38:12- 41:10). Citrin is unaware of the FA values of a healthy male (Ex. A - Citrin p. 46:16) and does not dispute the low FA scores

found by both Dr. Kagan and Dr. Walker. Citrin has no articles, publications or texts supporting his position that FA has no value from peer reviewed, non-litigation sources. Dr. Kagan and Dr. Walker state FA provides useful information to diagnose traumatic brain damage.

> "The best example is the 10-year look back at the use of DTI in traumatic brain injury which was published by Mike Lipton in 2013. And he looks at the best 100 articles that were produced from 2003 to 2013 and comes to the conclusion in that analysis that DTI detects clinically significant brain injury and it is correlated with outcome injury severity, all of those things. So it's one of the strongest representations, but many of the research papers have shown that. And the most impressive is that TRACK-TBI study I quoted from August of 2014."

(Exhibit B - Walker p. 96:15-25).

**5. Intent, State of Mind, or Motivations**

In addition, to the extent Dr. Citrin offer opinions on Jacob Luihn's intent, state of mind, or motivations, this testimony is outside the bounds of appropriate expert testimony. *Tillman v. C.R. Bard, Inc.*, 2015 WL 1456657, at *14 (M.D. Fla. Mar. 30, 2015) (citations omitted).

**6.      Non- radiological findings**

Dr. Citrin opined there were multiple normal Glasgow Coma Scores as well as multiple normal neurologic examinations, the complaint of Mr. Luihn of memory loss was not included as a diagnosis at the time of discharge. [Doc. 105-1, p. 11]. These facts are within the province of the jury, should come in through the proper witness, and should not be part of the advocacy based historical review of records allowed as opinions from this doctor. See below. Further that Dr. Citrin should not be allowed to opine that no broken facial bones meant it was unlikely that there was a brain injury. Dr. Citrin was not aware of the forces involved in the wreck, (Ex. A -

Citrin p. 86:4- 87:25) but admitted you could slip and fall and have a brain injury and the greater the forces the more likely the brain would have injury.

**7.     Medical Summary of Records**

Dr. Citrin performed a record review in this case for the Defendants and devotes a significant portion of his report to simply summarizing and stating his advocacy-based interpretation of documents in the record concerning Jacob Luihn's medical history. This summary simply strings together a narrative that the jury is equally capable of completing, and thus his summary should therefore be excluded. See *In re Rezulin Prod. Liability Litig.*, 309 F.Supp.2d 531, 551 (S.D.N.Y.2004); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006). See: *In re Viagra Products Liab. Litig.*, 658 F. Supp. 2d 950, 967 (D. Minn. 2009) "'[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.' (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y.2005)); *Baldonado v. Wyeth*, 2012 WL 1802066, 2012 WL 1802066, at *4. To the extent such evidence is admissible, it is "properly presented through percipient witnesses and documentary evidence." See *In re Rezulin*, 309 F.Supp.2d at 551, *Tillman v. C.R. Bard, Inc.*, 2015 WL 1456657, at *17 (M.D. Fla. Mar. 30, 2015).

## CONCLUSION

Wherefore, the Court should enter an Order limiting Dr. Citrin as set forth herein.

This 13th day of April, 2015.

                                                  **FRIED ROGERS GOLDBERG, LLC**

                                                  */s/ Joseph A. Fried*
                                                  JOSEPH A. FRIED
                                                  Florida Bar No. 0040850
                                                  *Attorney for Plaintiffs*
                                                  3560 Lenox Road NE
                                                  Suite 1250
                                                  Atlanta, GA 30326
                                                  Telephone: (404) 591-1800
                                                  Telecopier: (404) 574-6247
                                                  joe@frg-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via CM/ECF this 13th day of April, 2015 to: Jorge Padilla, Esq., Attorney for MXI, Inc. and Frank Nichols, luksmia-pleadings@ls-law.com, Luks, Santaniello, Petrillo & Jones, 150 West Flagler Street, Suite 1675, Miami, Florida 33130; Bruce M. Trybus, Esq., Attorney for State Farm, btrybus@ctkplaw.com, Cooney, Trybus, Kwaynick, Peets, 1600 W. Commercial Blvd., Suite 200, Ft. Lauderdale, Florida 33309; Morgan G. Adams, Esq., adams@tennesseeaccidentlaw.com, 1419 Market Street, Chattanooga, TN 37402; Dorothy Clay Sims, dcs@ocalaw.com, Sims & Stakenborg, 118 W. Fort King Street, Ocala, FL 34471; and Joseph A. Fried, joe@frg-law.com, Fried Rogers Goldberg LLC, 3560 Lennox Road, NE, Suite 1250 Atlanta, Georgia 30326-4275.

                                                **FRIED ROGERS GOLDBERG, LLC**

                                                 */s/ Joseph A. Fried*
                                                JOSEPH A. FRIED
                                                Florida Bar No. 0040850
                                                *Attorney for Plaintiffs*
                                                3560 Lenox Road NE
                                                Suite 1250
                                                Atlanta, GA 30326
                                                Telephone: (404) 591-1800
                                                Telecopier: (404) 574-6247
                                                joe@frg-law.com