UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 14-CV-21515-GAYLES/TURNOFF

JACOB LUIHN AND
JOHANNA LUIHN,

    Plaintiffs,

v.

MX, INC., ET AL,

    Defendants.
_____/

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION IN *LIMINE* TO LIMIT TESTIMONY OF DR. CHARLES CITRIN

Defendants, MX, Inc. ("MXI") and Frank Nichols ("Nichols") (collectively, "Defendants"), by and through undersigned counsel, hereby file their Response to Plaintiffs, Jacob Luihn ("Luihn") and Johanna Luihn's ("Mrs. Luihn") (collectively, "Plaintiffs"), Motion in *Limine* to Limit Testimony of Dr. Charles Citrin [D.E. 167], and as grounds state as follows:

## BACKGROUND

This matter arises from a March 13, 2012, intersection automobile and tractor trailer collision involving co-Plaintiff, Jacob Luihn ("Luihn" or "Plaintiff") and Nichols, who was driving a tractor trailer for co-Defendant MXI, at the time of the incident. Luihn alleges that he sustained injuries as result of the collision, while co-Plaintiff, Johanna Luihn ("Mrs. Luihn") is claiming loss of consortium damages.

Defendants retained Dr. Charles Citrin ("Dr. Citrin") in this matter to provide expert opinions with regards to Mr. Luihn's purported claim of traumatic brain injury. Dr. Citrin was properly disclosed pursuant to Federal Rule of Civil Procedure 26 and as part of the disclosure, Plaintiffs were provided with a copy of Dr. Citrin's Expert Report, as well as a Rebuttal Report. [D.E. 81]

Dr. Citrin is a medical doctor specializing in radiology and neuroradiology. *See Curriculum Vitae of Charles Citrin, attached as Exhibit "A;" see also Pg. 28, Ln. 8—12, 19—25; Pg. 33, Ln. 5--19 of the Deposition of Dr. Charles Citrin, attached as Exhibit "B."* He graduated from Downstate Medical Center, Brooklyn, New York in 1970. *See Exhibit "A."* His post-graduate training includes a Fellowship in Neuroradiology at the George Washington University Medical Center and a Residency in Diagnostic Radiology, Nuclear Medicine Angiography at the U.S. Public Health Service Hospital in Staten Island, New York. *Id.* Further, he is a Diplomate of the National Board of Medical Examiners and is board certified by the American Board of Radiology in Radiology since 1974. *Id.* He has also published numerous articles on radiology and neuro radiology. *Id.* Dr. Citrin has provided opinions at trial as an expert radiologist/neuroradiologist over two dozen times. *See List of Cases for which Dr. Charles Citrin provided Expert Testimony, attached as Exhibit "C."* Dr. Citrin has reviewed thousands of imaging studies and has over forty-one (40) years of experience in the field of radiology. *See Exhibit "A," see also Exhibit "B,"* at Pg. 96, Ln. 4—19.

In formulating his expert opinions, Dr. Citrin reviewed Mr. Luihn's medical history, depositions and imaging studies. *See January 18, 2015 Report and Rebuttal Report dated February 23, 2015, attached as Composite Exhibit "D;" see also Exhibit "B,"* at Pg. 35, Ln. 12—13.

It was Dr. Citrin's opinion, based on his scientific, technical and specialized knowledge, as well as his training and experience as a medical doctor specializing in radiology and neuroradiology and his review of Mr. Luihn's medical records that there were no findings consistent with a traumatic brain injury. *Id.*

Dr. Citrin's Expert Reports meticulously outline the medical records and diagnostic films that he reviewed, as well as his observations and conclusions regarding same. *Id.* It was his overall opinion that Mr. Luihn suffered from chronic ischemic disease of the brain prior to 2004, which had resulted in a stroke involving the left caudate region as well as causing mild chronic ischemic changes (leukoaurosis) involving the cerebral white matter. Further, it was his opinion that Mr. Luihn did have facial trauma secondary to the motor vehicle accident of March 13, 2012, and did have significant facial lacerations, but there

was no clear-cut evidence that he suffered a brain injury secondary to that incident. Additionally, it was his opinion that following the motor vehicle accident, Mr. Luihn demonstrated multiple normal Glasgow Coma Scores as well as multiple normal neurologic examinations, with the single exception of one complaint while in the hospital of some memory loss. Lastly, he concluded that the MRI and CT imaging studies acquired after the motor vehicle accident did not demonstrate any advancement in cerebral atrophy or advancement in chronic ischemic disease. In short, the appearance of the brain was as expected given Mr. Luihn's age and medical history. *Id.*

Additionally, Plaintiffs took the deposition of Dr. Citrin on March 5, 2015, and fully explored his expert opinions, as well as the basis for same. *See Exhibit "B."* Dr. Citrin testified that there was little to no change in the appearance of the brain when compared to cranial imaging studies taken before the subject incident. *Id.* at Pg. 24, Ln. 16 – Pg. 25, Ln. 2; Pg. 25, Ln. 12—17. It was his opinion that the brain scans did not indicate a reason for the symptoms Mr. Luihn was experiencing. *Id.* at Pg. 25, Ln. 3—11.

Dr. Citrin's review of the 2004 CT scan, which was taken before the incident, revealed that Mr. Luihn had previously suffered a stroke. *Id* at Pg. 52, Ln. 9—16. The evidence of the stroke was visible on all of Mr. Luihn's subsequent diagnostic imaging. *Id.* at Pg. 52, Ln. 17—21. In order to determine that Mr. Luihn had suffered a stroke he looked at the 2004 CT scan that demonstrated evidence of the stroke. *Id.* at Pg. 56, Ln. 4—13. He then reviewed the 2010 MRI scan that demonstrated chronic ischemic changes within the white matter of the brain. *Id.*; see also Id. at Pg. 78, Ln. 12—16. Additionally, Dr. Citrin testified that the 2004 CT scan revealed slight enlargement of the left lateral ventricle, which would be a focal atrophic change. *Id.* at Pg. 76. Ln. 13—18.

Moreover, as part of the formulation of his opinions, Dr. Citrin measured the transverse ventricles of Mr. Luihn's brain and compared them to pre and post motor vehicle studies, and found that they were unchanged. *Id.* at 76, Ln. 25 – Pg. 77, Ln. 12; Pg. 94, Ln. 19—Pg. 95, Ln. 7. As such, it was Dr. Citrin's reasoned opinion with a reasonable degree of medical probability that Mr. Luihn did not suffer traumatic brain injury, but rather vessel thrombosis which pre-existed the alleged incident. *Id.* at Pg. 119, Ln. 21 – Ph. 120, Ln. 3; Pg. 121, Ln. 15 – Pg. 122, Ln. 122.

Although, Dr. Citrin's opinions are aptly supported by the record evidence, his training, experience and scientific knowledge, Plaintiffs seek to limit his testimony. [D.E. 167] More specifically, Plaintiffs seek to limit Dr. Citrin from offering (1) any medical opinion, medical diagnosis or acting as a medical expert because he is only a radiologist, (2) any opinions as to the cause of Mr. Luihn's symptoms or any imaging findings unrelated to the cause of Mr. Luihn's symptoms because his opinions are speculative, no other medical provider has diagnosed Mr. Luihn with chronic ischemic disease and he provided no testimony that indicated his opinions are generally accepted by the scientific community; (3) testimony challenging the findings of Dr. Walker that Mr. Luihn has brain atrophy caused by the collision because, among other reasons, Dr. Walker's MRI was invalid; (4) that Fractional Anisotropy ("FA") is of no value in determining the presence or absence of traumatic brain injury, because he failed to provide any supporting articles, publications or texts; (5) opinions regarding Mr. Luihn's state of mind or motivation as improper expert testimony; (6) opinions regarding non-radiological findings, because such facts are within the province of a jury; and (7) excluding his medical summary of records because the Jury is capable of stringing together the narrative. *Id.*

As more fully explained *infra*, each and every one of Dr. Citrin's opinions are admissible, based upon a verifiable scientific basis and will assist the trier of fact in understanding and determining facts in issues in this case.

## ARGUMENT

Evidence should only be excluded on a motion in *limine* "when the evidence is clearly inadmissible on all potential grounds." *Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.* 2004 WL 1970144, at *4 (S.D. N.Y. Sept 3, 2004).

In ruling on admissibility of expert testimony, a trial court must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. Fed. R. Evid. 702. In requiring that expert testimony be directed to "scientific, technical or specialized" knowledge, Rule 702 governing admission of such testimony ensures that expert witnesses will not testify about

lay matters which jury is capable of understanding and deciding without expert's help. *Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

The Rule governing use of expert testimony is to be broadly interpreted. *Mannino v. International Mfg. Co.*, 650 F.2d 846, 849 (6th Cir. 1981). An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Fed. R. Evid. 702. In fact, "great liberality is allowed an expert in determining the basis of his opinions." *Mannino*, 650 F.2d at 853. Moreover, an expert may testify in terms of opinion or inference and give the reasons for his opinion. Fed. R. Evid. 705. The purpose of rule governing facts or data on which an expert bases an opinion or inference is to "make available to the expert all of the kinds of things that an expert would normally rely on in forming an opinion, without requiring that such be admissible in evidence." *Mannino*, 650 F.2d at 851. Therefore, under the Rule the expert is free to give his opinion "relying on the types of data an expert would normally use in forming an opinion in his area of expertise." *Id*.

"The only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth." *Id*. As such, when ruling on admissibility of expert testimony, a trial judge should not rely on labels, but must investigate the competence a particular proffered witness would bring to bear on the issues and whether it would aid the trier of fact in reaching its decision" and although an expert need not have complete knowledge of the field at issue he should be able to aid the jury in resolving a relevant issue." *Id*. at 850. "Acceptance of an expert witness' qualifications cannot depend on his precise skill or background in particular profession or industry; if subject matter falls within his experience in or overall knowledge of specialized skill, this is sufficient to qualify witness as expert." *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 858 (8th Cir. 1975); *see also Dychalo v. Copperloy Corp*. 78 F.R.D. 146, 149 (E.D. Pa. 1978) (holding that an "engineer who goes on to specialize does not thereby render him incompetent to testify as to principles basic to all engineering study").

Ultimately, "whether an opinion should be accepted is not for the trial judge," but for the finder of fact. *Mannino*, 650 F.2d at 853.

I. <u>Dr. Citrin's testimony regarding his medical opinion/diagnosis that Mr. Luihn did not suffer a traumatic brain injury jury, but rather chronic ischemic disease must not be excluded.</u>

Plaintiffs argue that Dr. Citrin should be prevented from testifying that he has a medical opinion or diagnosis concerning Mr. Luihn's lack of a traumatic brain injury because he is a (1) a radiologist; (2) does not have a doctor-patient relationship with Luihn; (3) is not in a position to offer any interpretations of any film studies as a basis for treatment; (4) did not consider his work on this matter as the practice of medicine; (5) has no internships or fellowships in neuropsychology; and (6) has no experience as a hand-on practitioner. Such a position is preposterous. If that were the case, not a single medical expert retained by a defendant could opine as to a plaintiff's purported injuries.

As indicated *supra*, Dr. Citrin is a medical doctor specializing in radiology and neuroradiology, with post-graduate training in neuroradiology and diagnostic radiology. *See Exhibit "A;" see also Exhibit "B" at Pg. 28, Ln. 8—12, 19—25; Pg. 33, Ln. 5—19.* As such, Plaintiffs' argument that Dr. Citrin cannot provide a medical diagnosis because he does not have a fellowship in neuropsychology is simply inaccurate.

Similarly, the fact that as a radiologist he does not have "hands-on" treatments of patients is also no basis to preclude his expert opinion, as a radiologist clinical practice does not involve meeting patients. *See Exhibit "A,"* Pg. 33, Ln. 5---19. Rather, a clinical practice in radiology involves reading scans, generating reports, communicating with referring physicians and making sure image quality is high. *Id.*

Dr. Citrin has provided opinions at trial as an expert radiologist/neuroradiologist over two dozen times and has reviewed thousands of imaging studies over his forty-one (41) years of experience in the field of radiology. *See Exhibit "A," see also Exhibit "B,"* at Pg. 96, Ln. 4—19; *Exhibit "C."* As a radiologist, he is more than qualified to offer his interpretations of the film studies he reviewed as a basis for treatment. Moreover, the mere fact that he specialized in the field of radiology does render him incompetent to testify as to basic medical principals. *E.g. Dychalo v. Copperloy Corp.* 78 F.R.D. 146, 149 (E.D. Pa. 1978).

Furthermore, the case law regarding the acceptance of an expert witness' qualifications is clear: "if subject matter falls within his experience in or overall knowledge of specialized skill, this is sufficient to qualify witness as expert." *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 858 (8th Cir. 1975).

As Dr. Citrin reviewed the pertinent diagnostic films and radiographic studies, he may certainly opine and diagnose that Mr. Luihn did not suffer a traumatic brain injury, but rather, chronic ischemic disease which pre-existed the alleged incident, as reflected in the various diagnostic studies that he reviewed and interpreted. *See Dura Automotive Systems of Indiana v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (finding the Committee Notes to the 1972 Proposed Rule 703 provides the example that a physician who may rely for a diagnosis on an x-ray).; *see also Feliciano v. City of Miami Beach*, 2012 WL 488105, *3 (S.D. Fla. 2012); *see also* Exhibit "B," at Pg. 119, Ln. 21 – Ph. 120, Ln. 3; Pg. 121, Ln. 15 – Pg. 122, Ln. 122.

    II.    <u>Dr. Citrin's Opinion's as to the Cause of Mr. Luihn's Symptoms are not speculative and are generally accepted by the scientific community.</u>

As referenced *supra*, Dr. Citrin is a radiologist that also specializes in neuroradiology. *Exhibit "A;" see also Pg. 28, Ln. 8—12, 19—25; Pg. 33, Ln. 5—19.* He has read thousands of imaging studies, testified as an expert witness over two dozen times at trial and has over his forty-one (41) years of experience in the field of radiology. *See Exhibit "A," see also Exhibit "B,"* at Pg. 96, Ln. 4—19.

As a basis for limiting his testimony, Plaintiffs argue that he did not know any facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation. Moreover, they argue that Dr. Citrin suggested that the Court accept his assurances that he used generally accepted scientific methodology. Dr. Citrin, in his Expert Reports and at deposition, provided more than an adequate basis of support for his opinions. Using his training, experience, education and scientific knowledge of medicine, radiology and neuroradiology, Dr. Citrin (as all radiologist do) reviewed Mr. Luihn's medical records and compared diagnostic imaging studies that were taken pre and post motor vehicle accident. *See* Exhibit "B," at *Id.* at Pg. 35, Ln. 12—13; Pg. 52, Ln. 9—16; Pg.

56, Ln. 4—13; Pg. 76, Ln. 25 – Pg. 77, Ln. 12; Pg. 78, Ln. 12—16; *see also Composite Exhibit "D."*

Specifically, Dr. Citrin reviewed Mr. Luihn's 2004 CT scan, which was taken before the incident and found that it revealed that Mr. Luihn had suffered a stroke sometime prior to the diagnostic testing. *Id* at Pg. 52, Ln. 9—16; Pg. 56, Ln. 4—13. He identified an area of low density abnormality that was clearly defined on slice #157.00mm, which represented a zone of encephalomalacia located at the anterior aspect of the left caudate nucleus. *See Pgs. 2—3, 8 & 11 of the Rebuttal Export Report dated February 23, 2015, attached as Composite Exhibit "D."*

Dr. Citrin then reviewed the 2010 MRI scan which he found also demonstrated chronic ischemic changes within the white matter of the brain. *Id.* at Pg. 78, Ln. 12—16. His review of the MRI revealed abnormal signal just lateral to the anterior horn of the left lateral ventricle seen on coronal T2-weighted scan series 5, images 9, 10, 11, 12 and to a lesser degree 13. *See Pg. 4 of the Rebuttal Export Report dated February 23, 2015, attached as Composite Exhibit "D."* Further review of the imaging study revealed an area of cavitation just lateral to the left frontal horn in the previously described zone of hyperintensity. According to Dr. Citrin, this clearly represented a zone of encephalomalacia was observed on series 10, image 19. Overall, he found the appearance as that of a left sided stroke with cavitation involving the brain just lateral to the left frontal horn associated with mild changes of bilateral leukoaurosis. *Id.*

Additionally, the evidence of the stroke was also visible on all of Mr. Luihn's subsequent diagnostic imaging. *Id.* at Pg. 52, Ln. 17—21. Upon review of a CT scan of the brain dated March 13, 2012, Dr. Citrin found evidence of a zone of encephalomalacia adjacent to the left frontal horn, best seen on series 2, image 39 and series 3, image 39. He also opined that the upper slices of this CT scan (series 2, images 46, 47, 48, 49, 50 and 51) demonstratd changes of very mild cerebral atrophy, somewhat greater than expected for Mr. Luihn's age. *See Pg. 5 of the Rebuttal Export Report dated February 23, 2015, attached as Composite Exhibit "D."*

Similarly, Dr. Citrin's review of Mr. Luihn's CT scan of the brain dated May 11, 2012, revealed continued evidence of a zone of encephalomalacia just lateral to the left frontal horn. *Id.*

Dr. Citrin's review of the MRI examination of the brain and DTI examination of the brain dated June 19, 2012, revealed the presence of a 2 mm area of leukomalacia within the region adjacent to the left frontal horn. There was little to no change in the appearance of the white matter when comparing the study of 2010 to 2012. He also noted a "bundle of abnormal beaded vessels" seen in two different areas. The abnormalities were not consistent, and were inconsistent with cerebral microbleeds associated with a shear injury. In the right frontal area, the linear structures were thinner more anteriorly and thicker more posteriorly, which appeared to be a thrombosed venous angioma or other vascular malformation. The appearance was inconsistent with the occurrence of a hemorrhagic event that took place on the date of the motor vehicle accident. Further, Dr. Citrin opined that the areas of non-specific hyperintensity within the white matter were likely related to ischemic microvascular disease with inflammatory angiopathy as a second possibility. The appearance was not consistent with a shear injury. He further noted the presence of a zone of leukomalacia change (encephalomalacia) involving the brain adjacent to the left frontal horn. The two zones of linear and likely thrombosed vascular structures were almost certainly congenital/neonatal in age and over the years had become thrombosed vascular malformations, most likely a venous malformations or variations thereof. *Id.* at Pg. 5—9.

Upon review of the MRI examination of the brain dated March 18, 2013, Dr. Citrin noted the presence of scattered foci of abnormal hyperintense signal in the periventricular and subcortical white matter. These finding were present at the time of the MRI examination of 2010 as was the area of infarct/leukomalacia adjacent to the left frontal horn. It was Dr. Citrin's opinion that since they were present prior to the motor vehicle accident of 2012 and there was clearly an area of leukomalacia/encephalomalacia adjacent to the left frontal horn prior to the motor vehicle accident of 2012, these areas of hyperintensity were related to chronic ischemic disease. *Id.* at Pg. 8—10.

As demonstrated *supra*, Dr. Citrin provided Plaintiffs with the facts that form the basis of his opinions and the methodology he used to arrive at same in his Experts Report. Notably, Plaintiffs did not go into any depth at deposition into the methodology Dr. Citrin used in formulating his opinions and cannot be allowed to cry foul after being given the opportunity to do so. In other words, Plaintiffs have not established that Dr. Citrin's testimony was not based on accepted reasoning and methodology. Rather, Dr. Citrin's methodology is the same as that of every radiologist enhanced by his board certification and his forty years of experience. He reads diagnostic images daily in his practice. Further, his opinions are also based upon his education and experience as a radiologist. As he provided the factual and scientific/medical basis for his opinions, based on the foregoing considerations, Dr. Citrin's knowledge and experience render his testimony reliable and adequately demonstrate that his testimony is based on good grounds. *Hershberger v. Ethicon Endo–Surgery, Inc.*, 2012 WL 524442, *11-*12 (S.D. W.Va. 2012). Further, contrary to Plaintiffs argument, Dr. Citrin's "inability to point to published literature supporting his opinions will not render those opinions inadmissible on reliability grounds. Id. at *12.

In other words, Dr. Citrin's Expert Reports and his deposition taken together provide the scientific methodology behind his opinions, as well as the facts that enabled him to express a reasonably accurate conclusion as to Mr. Luihn's lack of a traumatic brain injury. Taking the totality of the above, it is clear that Dr. Citrin's opinions are not based on mere conjecture or speculation, but on the record medical evidence and his specialized training, education, experience and scientific knowledge.

Further, Plaintiffs argument that Dr. Citrin cannot rely on medical records or reports and "is merely reciting hearsay, not otherwise admissible" is without merit. It is "widely recognized" that expert witness testimony is an exception to the rule against hearsay. *United States v. Williams*, 447 F.2d 1285, 1289 (5th Cir. 1971). As the *Williams* Court aptly stated:

> It has long been the rule of evidence in the federal courts that an expert witness can express an opinion as to value even though his opinion is based in part or solely upon hearsay sources. *Id*. "The rationale for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is

> competent to judge for himself the reliability of the records and statements on which he bases his expert opinion." Moreover, the opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data, but from education and from a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise. *Id.*

As such, Plaintiffs' argument that Dr. Citrin's opinions should be discarded because his review of certain medical reports, instead of diagnostic films constitutes inadmissible hearsay must be categorically rejected.

Additionally, Plaintiffs seek to limit the testimony of Dr. Citrin on the basis that no other doctor, neurologist or other medical expert has opined that Mr. Luihn had suffered a stroke. However, that is not the case. Dr. Marc Engel on June 19, 2012, determined that Mr. Luihn had a two-millimeter area of leukomalacia, which means old stroke. *See MRI Report of Dr. Mark Engel, attached as Exhibit "E;" and Exhibit "B,"* at Pg. 118 – Pg. 119, Ln. 11. Further, the Plaintiffs' own expert radiologist, Dr. Andrew Walker determined from the March 18, 2013 MRI that Mr. Luihn had cavitation (an old stroke) of the left frontal periventricular focus which was unchanged from previous studies. *See MRI Report of Dr. Andrew Walker, attached as Exhibit "F;" and Exhibit "B,"* at Pg. 118 – Pg. 119, Ln. 11. Therefore, Plaintiffs position that Dr. Citrin's testimony must be excluded because no other medical provider diagnosed him with a stroke is inaccurate and cannot serve as a basis to exclude his expert opinion.

Lastly, Plaintiffs attempt to limit/exclude the testimony in the mistaken belief that Dr. Citrin because he opines that "post wreck punctuate hemorrhages shown on imaging pre-existed the wreck" and "since they CANNOT be seen on earlier scans, the punctuate hemorrhages must be there." [D.E. 167] The Plaintiffs allege that such an opinion is "sheer speculation. *Id.* However, Plaintiffs mischaracterize and misconstrue Dr. Citrin's testimony. Dr. Citrin testified that Mr. Luihn **did not** have punctuate hemorrhages before or after the accident and that such an opinion was in a reasonable degree of medical certainty. *See Exhibit "B,"* at Pg. 63 – Pg. 64, Ln. 20 (emphasis added). As Plaintiffs

inaccurately portray Dr. Citrin's testimony, it cannot serve as basis to limit his expert testimony.

Dr. Citrin's testimony is admissible on the basis that it is grounded on scientific knowledge, his education, observations and experience as a radiologist specializing in neuroradiology. Moreover, his expert testimony will assist the trier of facts on matters that are beyond the understanding of the average lay person, and as such, his testimony should not be limited or excluded.

   III.   Dr. Citrin's Opinions regarding the validity of Dr. Andrew Walkers MRI Studies finding Mr. Luihn had brain atrophy are admissible and based upon verifiable and objective facts.

Plaintiffs next attempt to limit Dr. Citrin's opinions regarding the validity of Dr. Walker's opinions, which he based upon a March 13, 2013 CT scan taken at Kendall Regional Hospital. Specifically, the measurements used by Dr. Andrew were invalid because the position of Mr. Luihn's head in the scanner. Plaintiffs argue that since Dr. Citrin was not present during the scans there is no verifiable means by which to make such an opinion and that his testimony is speculative and should be excluded. However, Dr. Citrin fully explained in his report and at his deposition that he could tell from the CT scan images that the head was prominently tilted within the CT scanner because Mr. Luihn's brain had an unusual appearance while he was evaluating series 2, images 42, 43 and 44. On these three images, the right lateral ventricle was clearly visible and only a small part of the left lower ventricle was visible on image 42. This was also true of the petrous bones visualized on series 2, image 24. The left petrous bone was not visible until image 19. As a result, Dr. Citrin was able to determine that Mr. Luihn's head, while lying within the CT scanner, was not positioned properly. The head was sharply tilted so that the right side of the head was higher than the left side of the head. As such, any measurements of ventricular size would be unreliable and the size of the ventricles could not be compared to later examinations in which the head was not tilted. As Dr. Citrin's opinions were based on his review and observations of the diagnostic studies, his opinions are verifiable and based on hard facts, i.e., the film of the March 13, 2013 CT scan. *See Pg. 5 of the Rebuttal Export Report dated February 23, 2015, attached as Composite Exhibit "D;" see also*

*Exhibit "B," at Pg. 101, Ln. 6—22.* For these reasons, Dr. Citrin's testimony should not be limited.

    IV.    <u>Plaintiffs' argument that Dr. Citrin opines that Fractional Anisotropy is of no Value in determining the presence or absence of Traumatic Brain Damage is based on a misreading of the testimony</u>

As an additional basis to limit the testimony, Plaintiffs put forth that at deposition Dr. Citrin testified that "fractional anisotropy (FA) is of no value on determining the presence or absence of traumatic brain damage." However, that was NOT Dr. Citrin's testimony. What Dr. Citrin, who uses FA values in DTI in his own practice, actually testified to is that in THIS CASE, "[a]bnormal fractional anisotropy in the setting of pre-existing chronic ischemic disease and infarction is of no value in determining the presence or absence of a traumatic brain injury." *See Pg. 10 of the Rebuttal Export Report dated February 23, 2015, attached as Composite Exhibit "D;" see also Exhibit "B,"* at Pg. 52, Ln. 22 – Pg. 53, Ln. 212—25. Dr. Citrin never testified in the absolute that FA is never of any value in determining the presence or absence of traumatic brain damage. Rather, that it was in Mr. Luihn's case. As such, Plaintiff's argument that Dr. Citrin's testimony should be limited is not only misleading, but also based on a false premise and no record evidence. Further, the fact that Dr. Citrin did not provide any peer reviewed publications, articles or texts does not render his inadmissible on reliability grounds. *Hershberger v. Ethicon Endo–Surgery, Inc.*, 2012 WL 524442 at *12.

    V.    <u>Intent, State of Mind or Motivation.</u>

Defendants stipulate that Dr. Citrin will not offer testimony on Mr. Luihn's intent, state of mind or motivations.

    VI.    <u>As a medical doctor, Dr. Citrin is allowed to provide expert testimony with regard to his review of Mr. Luihn's medical records.</u>

Plaintiffs also seek to prevent Dr. Citrin from testifying that there was multiple normal Glasgow Coma Scores, multiple normal neurological examinations and that Mr. Luihn's complaint of memory loss was not part of his diagnosis at the time of discharge. The sole basis for excluding these opinions is that these are facts within the province of a jury. However, that is not the case. These facts are vital and underpin Dr. Citrin's

opinions that Plaintiff did not suffer a traumatic brain injury. For example, Dr. Citrin testified that the fact that Mr. Luihn's multiple Glasgow Coma Scores were normal was indicative of minimal to no brain damage. *See Exhibit "B,"* at Pg. 69, Ln. 2—10; Pg. 70, Ln. 9 – Pg. 71, Ln. 3. As an expert medical witness, Dr. Citrin is free to review the medical records and diagnostic studies and opine that pursuant to the objective medical evidence Mr. Luihn did not suffer a traumatic brain injury. *Feliciano v. City of Miami Beach*, 2012 WL 488105, *3 (S.D. Fla. 2012). This is exactly the type of expert testimony that aids a jury. Without expert testimony, a jury will not know what a normal neurological examination means in the instant matter much less what is a Glasgow Coma Scale.

Further, Plaintiffs attempt to prevent Dr. Citrin from opining that since Mr. Luihn did not have any broken facial bones, it was unlikely that there was a brain injury. Specifically, Dr. Citrin testified that there is a direct relationship between facial trauma and fractured bones and the severity of head injuries. *See Exhibit "B,"* at Pg. 122, Ln. 23 – Pg. 123, Ln. 4. The fact that there are broken bones is an indicator of a possible brain injury. *Id.* at Pg. 123, Ln. 5 -14.

In *Feliciano*, the plaintiff moved to strike the defendant's retained expert doctor on the basis that he testified that plaintiff had only suffered "minor physical trauma." 2012 WL 488105 at *2. The plaintiff argued that the evidence showed plaintiff "underwent a sustained brutal assault," and as such, there was no factual support for the position that the plaintiff suffered "minor physical trauma." *Id.* The defendants disputed the plaintiff's characterization of the event and argued that the objective evidence, which included medical records, demonstrated no bruising or other verifiable signs of anything other than minor trauma. *Id.* The *Feliciano* Court held that the expert's characterization of the injury as "minor physical trauma" was not a basis for striking his report or for precluding his testimony at trial. *Id.* The defendant's expert reviewed the plaintiff's medical records and concluded that the injuries described in those records were consistent with minor physical trauma. *Id.* The expert was entitled to opine based on the records he reviewed that the plaintiff, at most, suffered minor physical trauma. *Id.* The plaintiff was free to point out any weaknesses in the expert's methodology and opinions on cross-examination at trial.

Under the holding of *Feliciano*, Dr. Citrin's testimony concerning the lack of broken facial bones as indicative of Mr. Luihn not suffering a traumatic brain injury is clearly admissible and should not be limited or excluded.

VI. Dr. Citrin's Summary of Mr. Luihn's Medical Records is Admissible.

Dr. Citrin's report details the basis of his opinion and discusses his review of Mr. Luihn's voluminous medical records. The probative value of Dr. Citrin's medical records review is that it serves to assist the jury in understanding and evaluating the complicated medical and scientific facts relied upon by Dr. Cirtin to reach his opinion. Such information is admissible as the basis of an expert's opinion. It is not simply a narrative of uncomplicated facts or records presented solely for the purpose of construing a factual narrative or interpretation of conduct or views as to the motivation of parties.

Moreover, it is important to note that all of the cases cited by the Plaintiffs in their motion are distinguishable from the present matter in that they all deal with the trial court's exclusion of an expert's simple narratives of factual regulatory histories/events of certain corporations. None of the cases cited by the Plaintiffs in their motion addressed outlines of a medical expert's review of pertinent medical records relied upon to render an opinion as to the condition of the Plaintiff. *In re: Rezulin Prod. Liability Litig.*, 309 F. Supp.2d 531 (S.D. N.Y. 2004) (proper to exclude expert's narrative of regulatory history of Rezulin drug where jurors were equally capable of constructing from uncomplicated evidence.); *In re Viagra Products Liab. Litig.*, 658 F.Supp.2d 950 (D. Minn. 2009) (proper to exclude experts regulatory history of Viagra drug); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006) (in motion for class certification, proper to exclude experts report which was simply provided regulatory process and regulatory history leading to cancellation of insecticide DDT.); *Baldonado v. Wyeth*, 2012 WL 1802066, (N.D. Ill. May 17, 2012) (proper to exclude of expert's narrative regulatory history of promotion of hormone therapy products by Wyeth Pharmaceuticals.).

For these reasons Dr. Citrin's summary of the medical records should not be limited or excluded.

WHEREFORE, Defendants respectfully requests an Order denying Plaintiffs' Motion in Limine, and asks that the Court grant any such further relief as it deems necessary and proper.

April 30, 2015                                        Respectfully submitted,

                                             LUKS, SANTANIELLO,
                                             PETRILLO & JONES
*Attorneys for Defendant MX, Inc., and Frank Nichols*
150 W. Flagler Street, Suite 2750
Miami, FL  33130
Telephone:  (305) 377-8900
Facsimile:  (305) 377-8901


By: */s/ LUIS MENENDEZ-APONTE*
    DANIEL J. SANTANIELLO, B.C.S.
    Florida Bar No.: 860948
    LUIS MENENDEZ-APONTE
    Florida Bar No.:  772771
    JORGE PADILLA
    Florida Bar No.: 0054517
    LUKSMIA-Pleadings@LS-Law.com

**I HEREBY CERTIFY** that I filed the foregoing document with the Clerk of the Court electronically on April 30, 2015.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive electronic Notices of Electronic Filing.

/s/ LUIS MENENDEZ-APONTE
LUIS MENENDEZ-APONTE

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

*JACOB LUIHN v. MX, INC., et al.*

**SERVICE LIST**

Daniel J. Rheaume, Esq.
Welt & Rheaume, P.A.
4770 Hollywood Blvd.
Hollywood, FL 33021
pleadings@wrflalaw.com

Morgan Adams, Esq.
Law Offices of Morgan Adams
1419 Market St.
Chattanooga, Tennessee 37402
adams@tennesseeaccidentlaw.com
jennifer@tennesseeaccidentlaw.com

Dorothy Sims, Esq.
Sims & Stakenborg, P.A.
P.O. Box 3188
Ocala, FL 34478-3188
dcs@ocalaw.com

Joseph A. Fried, Esq.
FRIED ROGERS GOLDBERG, LLC
3560 Lenox Road NE
Suite 1250
Atlanta, GA 30326
joe@frg-law.com
sarah@frg-law.com

Rachel Turner Davant, Esq.
Billing, Cochran, Lyles, Mauro & Ramsey, P.A.
SunTrust Center, 6th Floor
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
rtd@bclmr.com

Lawrence N. Rosen
Assistant United States Attorney
99 NE 4th Street, Suite 300
Miami, FL  33132
Larry.Rosen@usdoj.gov